IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA H. LOCKETT,<br><br>    Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE,<br><br>    Defendant.<br>_____/ | No. C 05-03978 CRB<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

    Defendant Bayer Healthcare ("Bayer") moves for summary judgment, arguing that Plaintiff Jessica Lockett has failed to adduce admissible evidence to create a triable issue of fact as to the eight causes of action pled in her First Amended Complaint ("FAC"). The Court agrees that based on the evidence presented by Lockett, no reasonable juror could return a verdict in her favor on any of her claims. Accordingly, Bayer's motion for summary judgment is GRANTED.

**BACKGROUND**

    Jessica Lockett began working at Bayer's research and manufacturing site in Berkeley, California on June 22, 1998. See Lockett Decl. ¶¶ 2-3. The Berkeley facility is responsible for producing the pharmaceutical product Kogenate, a blood-clotting agent marketed to hemophiliacs. See Schreibstein Decl. Exh. A (hereinafter "Lockett Depo.") at 15:13-16:4.

Beginning on August 5, 2002, Lockett worked as a Media Prep Operator in Bayer's Building 60, where her duties included mixing chemicals to produce media, media filtration, and cleaning tanks and other equipment. See Lockett Decl. ¶¶ 5-6. Because Bayer produces human pharmaceuticals, the company must follow internal Standard Operating Procedures that are consistent with Good Manufacturing Practices ("GMP") that are, in turn, mandated by the United States Code of Federal Regulations. See Kuhlemann Decl. ¶ 5. As a Media Prep Operator, Lockett was charged with following strict reporting standards, including the filling out of batch production and control records that document "that each significant step in the manufacture, processing, packing, or holding of the batch was accomplished." 21 C.F.R. § 211.188.

The Batch Production Records ("BPR") mandated by § 211.188 are used to document that the steps required to manufacture a pharmaceutical are properly followed. See Lockett Depo. at 17:7-11. Bayer employees, including Lockett, were instructed that it was critical to record data on the BPRs at the time the process occurred, so that if there were a problem with a product batch, the company or the FDA could review the BPRs "and figure out exactly what happened when." Id. at 18:3-18. In fact, the accuracy of BPRs was of such concern to Bayer that the company circulated a memorandum – which Lockett received and signed – explaining that falsifying entries on a BPR – by, for example, documenting an operation before the operation actually took place – would result in immediate termination under a zero-tolerance policy. See id. at 41-43; id. Exh. 8 ("The company will practice zero tolerance when it comes to record falsification of any type. One incident of falsification will be grounds for discharge.").

In early June of 2004, Lockett approached Sherry O'Driscoll, a Human Resources official at Bayer to complain about treatment from her supervisor George Setiabudi. See Lockett Depo. at 97:13-22. Lockett explained that she had harassment charges to levy against Setiabudi, but did not provide any specifics about what Setiabudi had said or done. See id. 98:12-19. O'Driscoll requested that Lockett put her charges in writing. See id. at 98:14.

2

Lockett never put her charges in writing because she was contacted by Human Resources Consultant Kris Weilding a week or two after her complaint to O'Driscoll. See id. at 99:10-17. Weilding met with Lockett, and Lockett relayed her concern that Setiabudi docked her lunch time for leaving work to take keys to her husband even though Setiabudi "had not done that to any of the other employees." Id. at 101:2-9. Lockett also complained that Setiabudi wanted her to call him every time she "went anywhere or did anything" but did not treat other employees similarly. Id. at 101:14-24. Lockett raised concerns about other employees in her shift, telling Weilding that they refused to walk on the same side of the road or sit at the same table. See id. at 102:2-7. However, when Lockett met with Weilding, she never mentioned anything about race as an issue, see id. at 107:12-15, and Lockett acknowledged at her deposition that Setiabudi never made comments about Lockett's race, see id. at 107:22-108:1.

After meeting with Weilding, a larger gathering was organized so that Lockett could meet with supervisors in her group. See id. at 108:2-5. At this larger meeting, Lockett expressed concern about favoritism. See id. at 109:5-8. Notes written shortly after the group meeting confirm that although Lockett complained of ostracism, favoritism and unequal treatment, Lockett gave no hint that any of the objectionable conduct was based on race. See Randle Decl. Exh. 13 (email of Thomas Bamberger dated July 7, 2004).

Soon thereafter, Lockett met one-on-one with Thomas Bamberger – who had attended the larger meeting – and complained that "things were still happening." Id. at 111:17-20. For example, Setiabudi refused to allow Lockett to attend her daughter's "black graduation" ceremony. See id. at 111:23-24.[1] Bamberger recommended that Lockett "kiss George's ass." Id. at 114:2-4. During the meeting, Lockett never said that she felt singled out based on race, only that there was favortism in her group. See id. at 114:11-17.

---

[1] According to Lockett, a "black graduation" is "more of an African – you wear an African outfit and stuff. It's just called a black graudation." Lockett Depo. at 112:10-12. The "black graudation" was held by her daughter's high school approximately one month before the school's formal graudation ceremony. See id. at 113:9.

Meetings continued throughout June of 2004, in which Lockett expressed her concerns about favoritism. At no point, however, did Lockett ever approach anyone in Human Resources or management and complain that she felt like she was being disfavored because of race. See id. at 116:15-22.

In late June of 2004, Lockett's colleague, Farrah Vacca, approached Weidling with complaints about Lockett's behavior. See Weidling Decl. ¶ 2. Vacca provided Weidling with a written account of concerns, including that Lockett habitually signed BPRs for procedures not yet completed. See id. Exh. A. Weidling met with Vacca and found her complaints credible. See id. at ¶ 4. After contacting Bayer's Worldwide Quality Director and Bayer's Vice-President of Organizational Effectiveness, an investigative team was formed that included Weidling, Bruce Kuhlemann (Director of Quality Assurance), and Gustavo Mahler (Director of Media Fermentation). See id. ¶ 5. Bayer placed Lockett on paid administrative leave pending completion of the investigation. See id.

As part of the investigation, Bayer interviewed approximately a dozen witnesses, including Lockett. See id. ¶ 6. In addition to Vacca, two other operators provided seemingly credible and detailed testimony attesting to Lockett's executing BPRs without concurrently witnessing the events that she was purportedly verifying. See id. ¶ 7. When the investigative unit interviewed Lockett, she denied falsifying BPRs but admitted to other violations of Bayer policy. See Mahler Decl. ¶ 8.

In conducting the investigation, the unit discovered one BPR that provided strong evidence of falsification. On a BPR dated July 20, 2004, Lockett had placed check marks in boxes that should not have been checked because that day's cycle aborted. See Mahler Decl. Exh. A. For example, Lockett initialed the box suggesting that she had attached a status label to the media mix tank, a step that could not have been completed with an aborted cycle. See Schreibstein Decl. Exh. D at 13 n.15. This apparent falsification was significant to the investigative team because "it is nearly impossible to establish falsification." Kuhlemann Decl. ¶ 11. That is so because a completed BPR will generally appear exactly the same as one that was precompleted. See id.

4

Based on the evidence discovered, the investigative team concluded that it was appropriate to terminate Lockett, as well as two area supervisors – including Setiabudi – who were made aware of Lockett's alleged falsifications but did not elevate or address the issue. See id. ¶ 8. The investigative team made its recommendation to Justin Ford, then Bayer's Vice-President of Organizational Effectiveness, who affirmed the decision. See Ford Decl. ¶ 3. Bayer mailed Lockett a termination letter on August 10, 2004, explaining that the decision to fire was based on "falsification of records, failure to follow [Good Manufacturing Practices] procedures, and jeopardizing product quality, safety and reliability." See Weidling Decl. Exh. B.

Lockett filed a complaint in federal court on September 30, 2005, alleging that Bayer terminated her in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the California Fair Employment and Housing Act ("FEHA"), California Government Code § 12940. Lockett's First Amended Complaint pleads eight causes of action, including race discrimination, race-motivated retaliation, race-motivated harassment, and violation of public policy. Bayer has now moved for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is not warranted if a material fact exists for trial. See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). The underlying facts are viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). This can be done by either producing evidence negating an essential element of the plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to carry its ultimate burden at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).

5

Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. See id. at 324. In considering a motion for summary judgment, however, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Anderson, 477 U.S. at 250-51.

## DISCUSSION

Although Lockett has not alleged causes of action under Title VII of the Civil Rights Act of 1964, the same legal principles that guide a court in a Title VII dispute apply with equal force to Lockett's § 1981 and FEHA claims. See Metoyer v. Chassman, 504 F.3d 919, 941 (9th Cir. 2007); Manatt v. Bank of Am., 339 F.3d 792, 797 (9th Cir. 2003). Thus, in analyzing Bayer's motion for summary judgment, the Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). At the first step of McDonnell Douglas, the plaintiff must establish a prima facie case of discrimination or retaliation. If the plaintiff makes out her prima facie case of either discrimination or retaliation, the burden then "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory [or retaliatory] conduct." Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003). Finally, at the third step of McDonnell Douglas, if the employer articulates a legitimate reason for its action, "the presumption of discrimination drops out of the picture, and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required . . . under Fed.R.Civ.P. 56(c)." Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (citations and internal quotation marks omitted).

### A. Gender Discrimination

In response to Bayer's motion for summary judgment, Lockett has moved to strike the two causes of action predicated on gender discrimination. The Court construes Lockett's

request as a motion to voluntarily dismiss Counts Five and Seven of the First Amended Complaint, which is GRANTED. See Fed. R. Civ. P. 41(a)(2).

B. Race Discrimination

In Counts One and Four, Lockett alleged that Bayer intentionally discriminated against her on the basis of race in violation of § 1981 and California Government Code § 12940(a). To sustain both causes of action, Lockett must establish intentional discrimination by Bayer, that is, disparate treatment. See Gay v. Waiters' & Dairy Lunchmen's Union, 694 F.2d 531, 539 (9th Cir. 1982). Summary judgment to Bayer is appropriate on both counts because Lockett has failed to offer specific and significantly probative evidence that Bayer's stated reason for her termination was pretext.

*1. Prima Facie*

To establish a prima facie case of discrimination on the basis of race, Lockett must show that: (1) she was a racial minority; (2) she was qualified to remain in her job; (3) she was terminated; and (4) other similarly situated individuals were treated more favorably. See Lopez v. Country Ins. & Fin. Servs., 2007 WL 3088277, *1 (9th Cir. Oct. 23, 2007) (unpublished).

Bayer concedes that Lockett, who is African-American, is a racial minority and that she was terminated. However, Bayer argues that in light of the evidence discovered in their investigation, Lockett was not qualified to remain in her job. Moreover, Bayer argues, Lockett has not demonstrated that other similarly situated individuals were treated more favorably.

Although it is a close call, Lockett has narrowly presented sufficient evidence that other similarly situated employees were treated more favorably. Although the testimony is short on specifics and heavy on generalities, one Bayer employee stated in his deposition that he would be willing to testify that other Bayer employees were caught falsifying documents and not terminated. See Mahon Depo. at 40:7-22. The witness stated that he believed Lelia Maes, a non-African-American, was found to have willfully filled out a document incorrectly. See id. at 69-70. To prevail at trial, the Court would expect that the witness

would testify that Maes was similar to Lockett "in all material respects." <u>Moran v. Selig</u>, 447 F.3d 748, 755 (9th Cir. 2006). That is to say, the witness would have to testify that Bayer concluded that Maes intentionally fabricated – either through an investigation or otherwise – yet refused to terminate her. While it is not clear from the witness' deposition whether such testimony could be given, the Court is willing to draw all reasonable inferences in Lockett's favor.

Lockett has also submitted evidence sufficient to sustain her burden of proving the second element: that Lockett performed her job satisfactorily. In the context of the prima facie case, Lockett need only satisfy a "minimal" burden of proof, <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994), which can be satisfied with "very little" evidence, <u>Peterson v. Hewlett-Packard Co.</u>, 358 F.3d 599, 603 (9th Cir. 2004) (quoting <u>Chuang v. Univ. of Cal.</u>, 225 F.3d 1115, 1124 (9th Cir. 2000)). Lockett has submitted review forms indicating that as late as September of 2002, she received marks of "acceptable" in all job categories. <u>See</u> Randle Decl. Exh. 30. These forms, while of limited value because they pre-date the events in question by almost two years, do proffer some evidence that Lockett performed her job competently.

Even though Lockett had presented evidence to support her prima facie case, summary judgment is appropriate because Bayer has forwarded a legitimate, non-discriminatory reason for her termination, and there is no significant evidence of pretext.

*2. Legitimate Reason for Termination*

Once a prima facie case is established, the employer must "articulate" a legitimate reason for the employment decision that was made. <u>McDonnell Douglas</u>, 411 U.S. at 802. To "articulate" means to produce evidence. <u>See</u> <u>Rodriguez v. Gen. Motors Corp.</u>, 904 F.2d 531, 533 (9th Cir. 1990).

Bayer has provided overwhelming evidence in support of its contention that Lockett was fired for falsifying production and control records. The affidavits and documents submitted in support of Bayer's motion establish that an investigation unit was created, the unit discovered what they believed to be credible evidence of falsification, and the unit

8

recommended termination based on the evidence discovered. See, e.g., Weidling Decl. ¶¶ 7-9. All members of the investigative unit declared under oath that the decision to terminate was unrelated to Lockett's race. See id. ¶ 10; Mahler Decl. ¶ 11; Ford Decl. ¶ 4; Kuhlemann Decl. ¶ 14.

### *3. Pretext*

Because Bayer has articulated a legitimate reason for Lockett's termination, Lockett must "offer specific and significantly probative evidence that the employer's alleged purpose [was] a pretext for discrimination" to withstand the motion for summary judgment. Schuler v. Chronicle Broadcasting Co., 793 F.2d 1010, 1011 (9th Cir. 1986). Lockett can prove pretext "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (quotation omitted). Summary judgment to Bayer is appropriate because Lockett has done neither.

For purposes of pretext, the pertinent question is not whether Bayer was objectively correct that Lockett falsified documents, but merely whether Bayer "honestly believed its reason for its actions, even if its reason [was] foolish or trivial or even baseless." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002). On the record before it, the Court cannot say that Bayer's proffered explanation is unworthy of credence. Defendant has proffered unrebutted evidence that it conducted a sizeable investigation, which resulted in the termination of not only Lockett, but of the supervisor whom she accused of harassment because the supervisor failed to adequately respond to complaints that Lockett was falsifying documents. Lockett has not even attempted to explain why Bayer – if it merely intended to fire Lockett because she is black – went to the trouble of firing two non-African-American supervisors in the process. It is Lockett's accusation, not Bayer's explanation, that is unworthy of credence.

Further, Lockett has proffered no evidence showing that unlawful discrimination was the more likely motivation behind Lockett's termination. As Lockett acknowledged in her

9

United States District Court
For the Northern District of California

1  deposition, neither her supervisor – Setiabudi – nor anyone else ever made comments of a
2  racially offensive nature. See Lockett Depo. at 145:17-25. There is, put simply, no evidence
3  – in the form of documents, comments or even testimony – to support the notion that Bayer
4  made the decision to terminate Lockett because of her race. At the summary judgment stage,
5  Lockett cannot rest on mere allegations, but instead must produce admissible evidence to
6  show there exists a genuine issue of material fact. See Nissan Fire & Marine, 210 F.3d at
7  1102. This she has failed to do; accordingly, the motion for summary judgment is
8  GRANTED as to Counts One and Four.

### C. Race-Motivated Retaliation

In Counts Two and Eight, Lockett alleged that Bayer terminated her in retaliation for engaging in protected activity in violation of § 1981 and § 12940(h) of the California Government Code. FEHA expressly prohibits employers from discharging "any person because the person has opposed any practices forbidden under this part or because the person has failed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov. Code § 12940(h). Section 1981 does not include an express retaliation provision, but the Ninth Circuit has concluded that § 1981 encompasses retaliation claims. See Manatt, 339 F.3d at 795.

Both of Lockett's retaliation claims are analyzed under the framework of a claim for retaliation under Title VII. See id. at 801; Brooks, 229 F.3d at 928. Thus, Lockett bears the initial burden of making out a prima facie case of retaliation by establishing that: (1) she engaged in a protected activity, such as the filing of a complaint alleging racial discrimination; (2) Bayer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. See Manatt, 339 F.3d at 800. If Lockett has asserted the prima facie retaliation claim, the burden shifts to Bayer to articulate a legitimate, non-discriminatory reason for the adverse employment action. See id. If Bayer articulates such a reason, Lockett bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. See id.

Lockett's claims of retaliation fail at the outset because she cannot establish a prima facie case. There is no evidence that Lockett engaged in protected activity. Section 1981 and FEHA prohibit employers from discriminating against an employee because that employee has opposed any practice that the employee reasonably believes is unlawful under those provisions. See Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006); Manatt, 339 F.3d at 800-01; Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1043 (2005). Put conversely, Lockett must establish that she first complained of conduct that she reasonably believed was forbidden under § 1981 and FEHA in order to state a claim of retaliation.

Before her termination, Lockett raised the following complaints: (1) colleagues were ostracizing her by walking on the other side of the road and moving when she sat down at their table; (2) Setiabudi docked her lunch because she left work to take keys to her husband; (3) Setiabudi told Lockett to call him every the she "went anywhere or did anything" after she left her work area to escort a potential job applicant to another building; (4) Setiabudi refused to allow Lockett to leave work to attend her daughter's "black graduation;" and (5) colleagues resented her for forcing a transfer from the "graveyard" shift into the day shift through a grievance. See Lockett Depo. at 100-09. The acts of ostracism and favortism identified by Lockett do not constitute actionable conduct, and no employee would reasonably believe that they did. See Brooks, 229 F.3d at 929 ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action."). While Setiabudi may have treated Lockett more harshly than other employees when she left work for various purposes, there is no evidence that Setiabudi's treatment was due to Lockett's race. Without a nexus between Setiabudi's treatment and Lockett's race, no employee could reasonably believe that Setiabudi's conduct was forbidden by § 1981 or FEHA.

What is more, § 1981 and FEHA only prohibit discharging a person who has "opposed" a practice forbidden under those provisions. It is fatal to Lockett's retaliation claims that she never even hinted to Bayer that the conduct of Setiabudi or her colleagues

was racially motivated.[2] See Yanowitz, 36 Cal. 4th at 1046. To be sure, an employer may not avoid the reach of FEHA or § 1981 "when the circumstances surrounding an employee's conduct are sufficient to establish that an employer knew that an employee's" conduct in opposition to a practice "was based on the employee's reasonable belief" that the practice "is discriminatory." Id. That is to say, it would be sufficient if the circumstances surrounding Lockett's complaints put Bayer on notice that she was complaining about Setiabudi's and others' conduct because she believed their conduct was racially-motivated. But in the absence of any suggestion of racial impropriety, there was no reason for Bayer to believe that the conduct to which Lockett objected was more than garden-variety ostracism and favoritism. Hence, it cannot be said that Lockett "opposed" a practice which she reasonably believed to be unlawful under § 1981 and FEHA. Because Lockett's retaliation claim fails at the prima facie stage, summary judgment to Bayer on Counts Two and Eight is GRANTED.

### D. Race-Motivated Harassment

In Counts Three and Six, Lockett alleged unlawful harassment – hostile work environment – in violation of § 1981 and California Government Code § 12940(j)(1).[3] The elements of a hostile work environment claim under FEHA and § 1981 track the elements of such a claim under Title VII. See El-Hakem v. BJY Inc., 415 F.3d 1068, 1073 (9th Cir. 2005); Reitter v. City of Sacramento, 87 F. Supp. 2d 1040, 1041 n.1 (E.D. Cal. 2000). To prevail on a hostile workplace claim premised on race, Lockett must raise a triable issue of

---

[2] In an affidavit dated February 15, 2008, Lockett states that she notified both Satiabudi and manager Alan Goyke "of what she believed to be racial discrimination, racial harassment and a hostile work environment." See Lockett Decl. ¶ 11. To the extent that Lockett means to say she complained of conduct that she internally, but silently, believed to be racially motivated, the fact remains that she never expressed the slightest indication that any of the complained-of conduct had racial overtones. To the extent Lockett means to say that she did expressly complain of racial discrimination, her affidavit directly contradicts deposition testimony that she never approached anyone in human resources or management and advanced the notion that she was being disfavored because of race. See Lockett Depo. at 116:18-22. This kind of sham contradiction cannot create a triable issue for purposes of summary judgment. See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).

[3] The Complaint erroneously alleged harassment in violation of § 12940(h)(1), a non-existent provision. See FAC at 6. In light of the gravamen of the allegations in Count Six, the Court believes that Lockett intended to allege harassment in violation of § 12940(j)(1), which provides, in relevant part, that it is unlawful "[f]or an employer . . . because of race . . . to harass an employee. . . ."

12

fact as to whether (1) she was subjected to verbal or physical conduct because of her race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of Lockett's employment and create an abusive work environment. See Manatt, 339 F.3d at 798.

The third element requires that Lockett show that her "workplace [was] permeated with discriminatory intimidation ... that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 1993) (internal quotation marks and citations omitted). "The working environment must both subjectively and objectively be perceived as abusive." Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995). The Court uses a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment. See Harris, 510 U.S. at 23. Harris lists frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry. When assessing the objective portion of a plaintiff's claim, the Court assumes the perspective of the reasonable victim. See Brooks, 229 F.3d at 924.

Section 1981 and FEHA, like Title VII, are not "general civility code[s]." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (discussing Title VII). The allegedly harassing conduct that Lockett has identified – unequal treatment by Setiabudi after leaving the office, colleagues moving tables or crossing to the other side of the street – does not begin to approach the kind of conduct necessary to sustain a claim of hostile work environment. Successful claims of hostile work environment include harsh and, generally, repetitive verbal abuse. See, e.g., Kang v. U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002) (finding that a Korean plaintiff suffered national origin harassment where the employer verbally and physically abused the plaintiff because of his race); Nichols v. Azteca Rest. Enters., 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); Anderson v. Reno, 190 F.3d 930 (9th Cir. 1999) (finding a hostile work environment where a supervisor repeatedly

13

referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in public by drawing a pair of breasts on an easel while the employee was making a presentation and then told the assembled group that "this is your training bra session," and where the employee received vulgar notes and was patted on the buttocks and told she was "putting on weight down there"); Draper v. Coeur Rochester, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes). Indeed, the conduct alleged in this case falls short of numerous cases where no hostile work environment was found. See, e.g, Manatt, 339 F.3d at 799 (no hostile work environment where colleagues told jokes including phrase "China Man," pulled eyes back with fingers in an attempt to mock the appearance of Asians, and ridiculed plaintiff for mispronouncing words); Vasquez v. County of Los Angeles, 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others); Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea").

Lockett has identified one troubling incident where a co-worker allegedly called Lockett a "fat ass bitch" in the presence of a supervisor who laughed at the comment. See Lockett Decl. ¶ 11; Lockett Depo. at 235:1-5. But even assuming that this isolated comment related to Lockett's race, which it did not, and assuming the comment was sufficiently severe to alter the conditions of her employment, which it was not, the comment cannot be considered for purposes of this motion because it is hearsay. While the statement itself may be the statement of a party-opponent, Lockett only heard about the comment from a co-worker. See Lockett Depo. at 235:1-5. The communication between Lockett and her co-

14

worker is inadmissible hearsay, and therefore may not be considered in ruling on Bayer's motion. See Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

Because no reasonable juror could conclude that the harassing conduct identified by Lockett altered the conditions of her employment, summary judgment to Bayer on Counts Three and Six is GRANTED.

### E. Violation of California Public Policy

In her last claim, Lockett alleged that Bayer violated California's fundamental public policy against retaliation for reporting unsafe working conditions when Bayer terminated her in retaliation for filing a safety-related complaint with CalOSHA in March of 2004. See FAC ¶¶ 35-36.

In March of 2004, Lockett placed a call to CalOSHA to raise a safety issue at the Berkeley facility. See id. at 117:13-22. Lockett told an OSHA official that the door to a "cold room" – which was kept at minus 30 degrees – was closing and trapping employees within. See id. at 118:1-5. Lockett placed the call from a telephone in a cleaning room. Because the door to the room was closed and no one else was in the room, no one else heard the call. See id. at 121:22-122:4. Approximately six people would have had access to the phone at the time. See id. at 121:1-8.

Lockett's retaliation claim fails because she cannot prove a causal link between the CalOSHA complaint and her termination. To establish a causal link, she must prove that Bayer was aware that she was responsible for the complaint. See Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

All four of the Bayer employees involved in the termination decision stated in sworn affidavits that they were not aware of Lockett's involvement in the CalOSHA complaint. See Weidling Decl. ¶ 11; Mahler Decl. ¶ 11; Ford Decl. ¶ 4; Kuhlemann Decl. ¶ 14. Lockett has adduced no evidence to the contrary.

Lockett has offered a witness who would be willing to testify that one week after CalOSHA visited Bayer, Bob Russey – a Human Resources Consultant – stated that he knew who made the call. See Mahon Depo. at 61:18-63:8. Because Mahon's statement is

15

unrebutted – and is not hearsay because it constitutes the statement of a party-opponent – the Court assumes that Russey made such comment. But as Lockett recognizes, Russey was not involved in the termination decision, see Lockett Depo. at 133:8-10, and there is no evidence that Russey communicated his alleged knowledge to anyone on the investigative team.

Lockett also argues that Bayer may have fingered her by reviewing all of its phone records to identify the location of the phone used to call CalOSHA. Such unsubstantiated allegations are simply insufficient to defeat summary judgment. Because Lockett has adduced no evidence suggesting that those involved in her termination were aware of the CalOSHA complaint, summary judgment to Bayer on Count Eight is GRANTED.

## CONCLUSION

Lockett has failed to adduce admissible evidence sufficient to create a triable issue of fact as to her claims for discrimination, retaliation, and harassment. Accordingly, summary judgment is GRANTED to Bayer.

**IT IS SO ORDERED.**

Dated: March 3, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE